**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|                                                      |   |                        |
|------------------------------------------------------|---|------------------------|
| TRAVIS MOYA,                                         | ) |                        |
|                                                      | ) |                        |
|                 Plaintiff,                           | ) |                        |
|                                                      | ) |                        |
| vs.                                                  | ) |                        |
|                                                      | ) |                        |
| CITY OF ALPHARETTA,                                  | ) | CIVIL ACTION NO.       |
| ALPHARETTA POLICE CHIEF                              | ) | _____       |
| JOHN ROBISON, ALPHARETTA                             | ) |                        |
| POLICE LIEUTENANT R.A.                               | ) |                        |
| SPLAWN, ALPHARETTA POLICE                            | ) |                        |
| OFFICER MICHAEL ESPOSITO,                            | ) |                        |
| ALPHARETTA POLICE OFFICER J.J.                       | ) |                        |
| FRUDDEN, ALPHARETTA POLICE                           | ) |                        |
| OFFICER CHRISTOPHER                                  | ) |                        |
| BENFIELD,                                            | ) |                        |
|                                                      | ) |                        |
|                 Defendants.                          | ) |                        |

## COMPLAINT

**COMES NOW** Plaintiff Travis Moya ("Plaintiff"), by and through his undersigned counsel of record and hereby files his Complaint for Damages.

## JURISDICTION, VENUE, AND PARTIES

1.      The above-captioned civil action for damages arises out of the unlawful warrantless arrest and use of excessive force against Plaintiff Travis Moya and is brought pursuant to 42 U.S.C. § 1983 and § 1988 for violations of Plaintiff's federal

1

rights as guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, and pursuant to Georgia law.

2. This Court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the subject incident occurred in Fulton County within the Northern District of Georgia.

4. Defendant City of Alpharetta (the "City" or "Alpharetta") is a municipal corporation organized under the laws of the State of Georgia.

5. Defendant Chief John Robison is a resident of the State of Georgia and was at all times material herein the Chief/Director of the Department of Public Safety and was the final policymaker with regard to the City's performance of police functions.

6. Defendant R.A. Splawn is a resident of the State of Georgia and was at all times material herein employed by Defendant City of Alpharetta as a police K9 officer and police lieutenant and supervisor in the K9 Unit and is being sued in his individual capacity.

7.     Defendant Michael Esposito is a resident of the State of Georgia and was at all times material herein, a police officer and K-9 handler employed by Defendant City of Alpharetta and is being sued in his individual capacity.

8.     Defendant Esposito was assigned as K9 Ares' handler and worked with Ares as a K9 Team on the City's K9 Unit.

9.     Defendant J.J. Frudden is a resident of the State of Georgia and was at all times material herein, a police officer employed by Defendant City of Alpharetta and is being sued in his individual capacity.

10.     Defendant Christopher Benfield is a resident of the State of Georgia and was at all times material herein, a police officer employed by Defendant City of Alpharetta and is being sued in his individual capacity.

11.     Defendants are subject to the jurisdiction and venue of this Court.

## FACTUAL ALLEGATIONS

12.     Shortly before 7:30pm on July 25, 2021, Plaintiff's family called 911 and requested an ambulance at their residence and did not report any information indicating that Plaintiff had committed a crime, that he had a weapon, or that he was threatening physical harm to his family, himself, or any other person.

13.     The 911 operator dispatched APD officers Benfield, Frudden, and Esposito and his police K-9 Ares (collectively the "defendant officers") to

Plaintiff's residence and did not advise them of any information to reasonably indicate that Plaintiff had committed a crime, that he had a weapon, or that he was threatening physical harm to his family, himself, or any other person.

14.     Defendant Esposito was the first officer to arrive at the Moya residence and was shortly thereafter followed by Officers Frudden, Benfield, and a Milton officer.

15.     As reflected on Esposito's body camera video footage which is expressly incorporated by reference herein, when the officers arrived, Plaintiff was lawfully standing at the front of his driveway with his wife ("Mrs. Moya"), was not committing a crime, was not acting in a violent or tumultuous manner, and posed no threat of harm to himself, his wife, or any other person.

16.     Each of the defendant officers remained in the street and watched Plaintiff interact with his wife from several yards away and made no effort to physically separate Plaintiff from his wife.

17.     Mrs. Moya briefly walked over to Esposito in the street and explained that Plaintiff was acting abnormally and had been breathing hard and crying, that Plaintiff had punched a wall and threw a chair, and did not know why he was "not acting like his normal self," but did not provide any information which could have

caused a reasonable officer to believe that Plaintiff had physically threatened any family member at the residence or that he had otherwise committed a crime.

18.     After briefly speaking to Esposito in the street, none of the officers objected or tried to stop Mrs. Moya from returning to stand next to Plaintiff in the driveway.

19.     Plaintiff's young daughter walked outside of the home and stood next to Plaintiff and Mrs. Moya in their driveway.

20.     None of the defendant officers made any effort to physically separate Plaintiff from his wife or young daughter, and otherwise expressed no indication that they believed Plaintiff posed a threat of harm to them or any other person inside or outside the residence.

21.     None of the defendant officers asked for anyone inside the home to come out and speak to them.

22.     After calmly standing in the driveway for several minutes with his wife and daughter, Plaintiff and his family began walking to their front door to go inside, at which point the defendant officers told Plaintiff, for the first time, to stop and come talk to them.

23.     No reasonable officer could have believed that Plaintiff posed a threat of harm to his wife, his daughter, or any other person in the house.

24.     When Plaintiff calmly continued walking toward his front door with his family, the officers stepped onto Plaintiff's yard and approached Plaintiff for the first time.

25.     Officers Frudden and Benfield physically grabbed Plaintiff and used physical force to take him to the ground.

26.     Plaintiff landed with both hands and knees firmly planted on the ground in the push-up position and Officers Frudden, Benfield, and the third Milton officer immediately got on top of him.

27.     Plaintiff did not verbally or physically resist, attempt to flee, or pose any physical threat to any of the officers on the ground, and instead quietly remained in the push-up position with both hands on the ground, and was not disobeying any lawful commands by doing so.

28.     While the three officers were securing Plaintiff on the ground, Esposito suddenly commanded K-9 Ares to bite Plaintiff's arm.

29.     Instead of Plaintiff's arm, the K-9 aggressively began biting Plaintiff's jacket sleeve and thrashing it around, at which point Esposito commanded the K-9 to release the bite by shouting "Los!"

30.     K-9 Ares did not release the jacket sleeve as commanded and as such, Officer Frudden had to physically wrestle the jacket sleeve out of Ares' mouth.

31.     Immediately after the jacket sleeve was wrestled out of his mouth, K9 Ares exhibited uncontrolled aggression by biting down on Plaintiff's left bicep without a bite command and in contravention of Esposito's prior command to stop.

32.     Seconds after the K-9 bit down on Plaintiff's arm, the defendant officers commanded Plaintiff, for the first time, to lay flat on the ground and to put his hands behind his back.

33.     Plaintiff immediately complied with the officers' commands by laying flat on the ground and put his hands behind his back which the three officers on top of him firmly gripped and fully secured behind his back.

34.     Plaintiff was not resisting, was not posing any threat, and was begging the officers to please get the dog off of him.

35.     Plaintiff could not defend himself from the K-9 because the three officers on top of him had both of his hands firmly gripped and handcuffed behind his back.

36.     While the three officers were holding Plaintiff down, K9 Ares continued aggressively chewing and ripping out significantly large chunks of muscle and flesh from Plaintiff's arm for close to a minute while he was not posing

any safety threat, including after Plaintiff's hands had been fully secured and handcuffed behind his back.

37.    Despite being in a position to intervene, Defendants Frudden and Benfield took no action whatsoever to stop the unlawful K9 bite.

38.    After allowing Ares to bite and chew on Plaintiff's arm for close to a minute, Esposito physically lifted Ares off the ground and carried him to the street in this lifted position.

39.    Plaintiff was arrested without a warrant on a single charge of felony obstruction.

40.    Following Plaintiff's warrantless arrest, Officer Frudden swore out an arrest warrant for said charge without actual or arguable probable cause, which was later dismissed.

41.    Plaintiff suffered excruciating physical injuries and pain and suffering, permanent disfiguration to his arm, loss of wages, humiliation, significant emotional trauma and distress, and other damages as a direct and proximate result of Defendants' violations of law.

## COUNT I
### False Arrest and Malicious Prosecution
### Defendants Esposito, Frudden, and Benfield

42.     The preceding paragraphs are hereby incorporated as if fully restated herein.

43.     Defendants Esposito, Frudden, and Benfield falsely arrested Plaintiff without a warrant and without actual or arguable probable cause in violation of Plaintiff's clearly established Fourth Amendment rights.

44.     Every reasonable officer would have known that arresting Plaintiff without a warrant or probable cause would violate the Fourth Amendment.

45.     Defendant Frudden maliciously prosecuted Plaintiff and swore out an arrest warrant for felony obstruction without actual or arguable probable cause, pursuant to which Plaintiff was subjected to a seizure.

46.     No reasonable officer could have believed that there was probable cause that Plaintiff committed a crime at the time they used force to effect his arrest and/or at the time Officer Frudden swore out an arrest warrant.

47.     Every reasonable officer would have known that swearing out an arrest warrant without probable cause would violate the Fourth Amendment.

48.     Plaintiff's prosecution for felony obstruction was properly *nolle prossed* thereby terminating the prosecution in his favor.

49.     As a direct and proximate result of Defendants' violations of clearly established law, Plaintiff suffered damages.

50.     Defendants Esposito, Frudden, and Benfield are not entitled to qualified immunity and are liable for damages in their respective individual capacities for false arrest in violation of Plaintiff's clearly established Fourth Amendment rights.

51.     Defendant Frudden is not entitled to qualified immunity and is liable for damages in his individual capacity for malicious prosecution in violation of Plaintiff's clearly established Fourth Amendment rights.

**COUNT II**
**Excessive Force**
**Defendants Esposito, Frudden, and Benfield**

52.     The preceding paragraphs are hereby incorporated as if fully restated herein.

53.     Defendants Frudden and Benfield used objectively unreasonable force by physically grabbing Plaintiff and taking him to the ground without actual or arguable probable cause and while Plaintiff was not resisting, attempting to flee, or posing any physical threat in violation of clearly established law.

54.     Defendant Esposito used objectively unreasonable and grossly disproportionate excessive force by deploying K-9 Ares and commanding him to bite Plaintiff, and by allowing the K-9 to continue aggressively chewing on Plaintiff's arm for close to a minute after it became apparent that Plaintiff had been

fully secured, not resisting, not attempting to flee, and posing no danger whatsoever, which violated clearly-established law.[1]

55.     Based on the totality of circumstances confronting the officers, it was clearly established that the use of any force without probable cause, much less significant force of an extended K9 bite, was grossly disproportionate and objectively unreasonable.

56.     As a direct and proximate result of Defendants' violations of clearly established law, Plaintiff suffered damages.

57.     Defendants Esposito Frudden, and Benfield are not entitled to qualified immunity and are liable for damages for their use of excessive force in violation of clearly-established law.

58.     Defendant Esposito is not entitled to official immunity and is liable for assault and/or battery under state law because he acted with actual malice.

## COUNT III
## Failure to Intervene
## Defendants Frudden and Benfield

59.     The preceding paragraphs are hereby incorporated as if fully restated herein.

---

[1] <u>Trammell v. Thomason</u>, 335 F. App'x 835, 844 (11th Cir. 2009).

60.     Defendants Frudden and Benfield were both in a position to intervene to stop the unlawful and extended K9 bite but took no action to intervene in violation of Plaintiff's Fourth Amendment rights.

61.     At all times material herein, it was clearly established that an officer is required to intervene to stop the use of unlawful force, including an unlawful K9 bite, if in a position to do so.

62.     Defendants Frudden and Benfield are not entitled to qualified immunity and are liable for damages for failing to intervene in violation of Plaintiff's clearly established Fourth Amendment rights.

**COUNT IV**
**Unconstitutional Official Policies Authorizing Excessive Force**
**Chief Robison and City of Alpharetta**

63.     The preceding paragraphs are hereby incorporated as if fully restated herein.

64.     Defendant Chief John Robison was appointed Chief/Director of the City's Department of Public Safety in January 2017 and was the final policymaker for the City with final policymaking authority regarding the written policies and procedures and training governing the Alpharetta Police Department ("APD") and its officers in performance of the City's police functions.

65.     Chief Robison established and/or approved the written policies and procedures governing the conduct of APD officers on duty and the City's performance of police functions, which constitute the official policy of the City of Alpharetta.

66.     The City's official policies are facially unconstitutional and direct K9 officers to use grossly disproportionate and objectively unreasonable non-deadly force when confronted with any level of "resistance" identified in the UOF policy, including passive resistance after a suspect has been secured and/or poses no immediate threat under the totality of circumstances.[2]

67.     At all times material herein, it has been clearly established that "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight."[3]

68.     To determine whether force is reasonably proportionate and objectively reasonable under *Graham*, an officer <u>must</u> consider and weigh the "quantum of force employed" against "the severity of the crime at issue; whether the suspect poses an

---

[2] APD Policy 04-16, §§ II-B, V-A, VIII (identifying different levels of "resistance").

[3] Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002).

immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight" under the totality of circumstances.[4]

69.     Under *Graham*, a suspect's "active resistance" is only one factor that an officer must consider, and does not alone justify the use of force unless the suspect is "actively resisting" in a manner which poses a threat to the officer's safety under the totality of circumstances.[5]

70.     According to the City's official K9 policy, use of a police K9 is a form of non-deadly force governed by the UOF policy.

71.     The UOF policy instructed APD officers to use non-deadly force, including deployment of a police K9, to overcome any level of "resistance" regardless of whether the suspect has been fully secured or whether any such resistance poses a physical safety threat under the totality of circumstances.[6]

72.     The City's official UOF and K9 policies provide no guidance or instruction to K9 officers regarding the limitations or manner in which a police K9

---

[4] Dukes v. Deaton, 852 F.3d 1035, 1042 (11th Cir. 2017).

[5] Vinyard v. Wilson, 311 F.3d 1340, 1347–48 (11th Cir. 2002).

[6] APD Policy 04-16, §§ II-B, IV-A, V-A, VIII.

may be deployed to overcome "resistance.," *i.e.,* whether police K9s are authorized to "bite and release," to "bite and hold," etc.

73.     Pursuant to the UOF policy, psychological "non-verbal cues," verbal protests, verbal non-compliance, and other forms of passive resistance which pose no physical threat, each constitute "resistance."[7]

74.     As set forth in the City's official UOF policy, any passive "physical activity" which "does not pose an imminent threat to the officer or to others" but which in any manner impedes an officer from carrying out his duties, including but not limited to "a protestor who sits down," constitutes "resistance."

75.     Pursuant to the City's official UOF policy, APD officers were trained that nonviolently "pulling away from the officer" constitutes "resistance."

76.     As set forth in the City's official UOF policy, APD officers were trained that any person who verbally protests, or who is "bracing [or] tensing" a body part, constitutes "active resistance."[8]

77.     In accordance with the UOF policy, APD officers were trained that they were legally justified to deploy a police K9 and any other form of non-deadly force

---

[7] APD Policy, § VIII-A.

[8] *Id.,* Definitions.

15

to overcome any level of "resistance" described above, without consideration and regardless of the extent of any safety threat.

78.     According to the UOF policy, the other factors identified in *Graham* are not dispositive of objective reasonableness and are instead merely suggestions which APD officers "can" consider to "assist in determining reasonableness."[9]

79.     The City is liable for its official policies authorizing and directing APD officers to use grossly disproportionate and objectively unreasonable excessive force by deploying a K9 to overcome passive non-violent "resistance" against suspects who are fully secured and otherwise pose no immediate safety threat.

80.     At all times material herein, Esposito and the other defendant officers were acting pursuant to the unconstitutional official policies and training established by Chief Robison and caused Plaintiff damages by violating Plaintiff's clearly established Fourth Amendment rights as directed therein.

81.     The City's unconstitutional official policies and training were the moving force behind Plaintiff's injuries and as such, the City is liable to Plaintiff for its unconstitutional official policies.

## COUNT V

---

[9] *Id.*, § III-B, contrast with VII-C and VII-D (instead of the *Graham* factors, APD officers are instructed that they "must" and "should" consider various other "subject" and "officer" factors, none of which indicate that an officer is required to determine whether or the extent to which a suspect poses an immediate threat of harm).

## Unconstitutional Pattern and Practice of Excessive Force
## Chief Robison and City of Alpharetta

82.     The preceding paragraphs are hereby incorporated as if fully restated herein.

83.     The City maintained an unconstitutional custom and widespread pattern and practice of acquiescence to APD officers using objectively unreasonable non-deadly force as directed by the City's official policy and training.

84.     For example, on May 8, 2018, APD officers Michael Swerdlove and James Legg used non-deadly force against Rose Campbell to overcome her "passive resistance" while waiting for a supervisor during a traffic stop for failure to maintain lane.

85.     In connection with the IA investigation of the Campbell incident, APD Lt. J. Braithwaite analyzed the officers' use of force and concluded that it complied with the Fourth Amendment and applicable departmental policy; Lt. Braithwaite's analysis clearly illustrates the unconstitutionally of the officers' force, as well as the facial unconstitutionality of the City's official UOF policy regarding application of the *Graham* factors:

> "Ms. Campbell refused to exit the vehicle. Relating to Graham v. Conner, the severity of the crime was very low but there was legal authority to ask her to exit the vehicle. However, <u>she was not a significant threat, she was not armed nor made any threating comments or statements</u>. Concerning Ms. Campbell, the best

standing for the use of force was active resistance. Ms. Campbell refused to exit the vehicle, did not comply with officers' commands and held on to the seatbelt refusing to let go. All of those are considered active resistance. In fact, there was no attempt to flee or evade arrest. Thus, the entire case relating to Ms. Campbell is based off of active resistance."

86.     In accordance with the City's official UOF policy, Lt. Braithwaite approved of the officers' use of force against a suspect solely because she was "actively resisting" after expressly disregarding the other two *Graham* factors which admittedly weighed against the officer's use of force.

87.     Chief Robison reviewed and approved of Lt. Braithwaite's conclusions as set forth in his report and took no remedial action.

88.     Lt. Braithwaite's analysis of the officers' use of force is representative of the analysis which all APD supervisors undertake when reviewing uses of non-deadly force.

89.     APD prepared and submitted an annual use of force report to the Chief for review and approval summarizing the uses of force reported in the department each year.

90.     Chief Robison had knowledge that in 2018, at least 53 APD officers reported using non-deadly force against citizens, and that the large majority of those 53 officers reported using force  to "gain compliance" from suspects who were not "physically combative."

91.     Chief Robison had knowledge that in 2019, at least 52 APD officers reported using non-deadly force against citizens and that only three of them were for "officer self-defense," with the large majority being used to "gain compliance."

92.     Chief Robison had knowledge that in 2020, at least 39 APD officers reported using non-deadly force against citizens.

93.     Chief Robison had knowledge that in 2021, at least 58 APD officers reported using non-deadly force against citizens, including Esposito and Frudden who reported at least 6 separate uses of force within a short five-month period from February 2021 through and including the subject incident on July 25, 2021.

94.     APD supervisors concluded that each of the 200+ APD officers who reported using non-deadly force from 2018 to 2021 was justified and acting in compliance with policy by using force in response to any level of "resistance" regardless of the threat of harm, and had knowledge of the need for remedial action and changes to the official policy and training.

95.     Chief Robison had knowledge nevertheless turned a blind eye and took no remedial action to address the widespread pattern and practice of acquiescing to the rampant use of objectively unreasonable non-deadly force in accordance with the City's official UOF policy, which amounts to an unofficial custom and practice of deliberate indifference which was the moving force behind Plaintiff's injuries.

96.     The City is liable under § 1983 for its unofficial custom and practice of deliberate indifference to the widespread and rampant use of objectively unreasonable force in accordance with the City's official UOF policy.

## COUNT VI
## Unconstitutional K9 Training and Ratification
## Lt. Splawn, Chief Robison, and City of Alpharetta

97.     The preceding paragraphs are hereby incorporated as if fully restated herein.

98.     On or about February 5, 2021, Esposito and Ares received their initial K9 certification after completing a training program in North Carolina.

99.     Esposito prepared detailed logs documenting all K9 training exercises he and K9 Ares performed, which training logs were submitted and reviewed by Lt. Splawn and Chief Robison.

100.    Lt. Splawn and Chief Robison were responsible for direct supervision of Esposito and Ares and their K9 training.

101.    Lt. Splawn and Chief Robison had knowledge that while performing criminal apprehension and bite work exercises during their initial training certification in NC, K9 Ares exhibited problems with uncontrolled aggression by chewing during bites and ignoring handler commands to stop and recall after a bite. command, which problems every reasonable K9 officer would have known

substantially and unjustifiably increased the risk of inflicting serious injury and required remedial action before placing the K9 into service.

102.    Lt. Splawn and Chief Robison had knowledge that Ares again exhibited uncontrolled aggression on or about February 5, 2021 when he ignored handler commands and aggressively bit Esposito during a training exercise, which uncontrolled aggression in fact caused serious injuries requiring medical treatment.

103.    Despite actual knowledge that Ares' problems with uncontrolled aggression had in fact caused unjustified serious injuries to Esposito, Chief Robison and Lt. Splawn took no remedial action.

104.    Lt. Splawn and Chief Robison had knowledge that during a training exercise on June 23, 2021, Ares again exhibited uncontrolled aggression by chasing and almost biting his trainer after ignoring handler commands to stop, which problems were documented in Esposito's training logs as follows:

> K9 Ares was given his bite command. Before he was able to conduct an apprehension, I gave him his down command. K9 Ares did not stop. Due to the manner the drill was set up, the trainer in the bite suit was able to retreat into a closed building, which prevented K9 Ares from conducting an apprehension. This drill was performed below standards and remedial training will follow.

105.    Lt. Splawn and Chief Robison had knowledge that K9 Ares' had not received any remedial training to specifically address his known problems with uncontrolled aggression and inability to comply with handler commands to stop.

106.   Lt. Splawn and Chief Robison had knowledge that from February 5, 2021 through and until the subject incident on July 25, 2021, K9 Ares had only completed a total of <u>two</u> training exercises involving bite work or recalls which both took place on June 23, 2021 during which K9 Ares performed below standards and required remedial training.

107.   Lt. Splawn and Chief Robison had knowledge that from February 5, 2021 through and until the subject incident on July 25, 2021, Esposito did not conduct any training exercises with Ares addressing criminal apprehensions.

108.   Lt. Splawn and Chief Robison had knowledge of the obvious need for training of police K9s in criminal apprehensions, bite work, and recalls, but nevertheless took no remedial action.

109.   Lt. Splawn and Chief had knowledge of the obvious need for remedial training to address Ares' documented problems with uncontrolled aggression during his certification training exercises; on February 5, 2021 when he ignored commands and exhibited uncontrolled aggression by biting and seriously injuring his handler; and on June 23, 2021 when Ares again ignored commands and exhibited uncontrolled aggression, but nevertheless took no remedial action to address Ares' specific problems with uncontrolled aggression.

110.   Every reasonable K9 supervisor would have known that absent training in criminal apprehensions, bite work, and recalls, and without remedial training to address Ares' specific problems with uncontrolled aggression, Ares would continue exhibiting uncontrolled aggression and would inevitably cause objectively unreasonable and disproportionately serious injury without justification.

111.   Despite actual knowledge of the substantial risk of harm that would result absent remedial action, Lt. Splawn and Chief Robison nevertheless turned a blind eye and took no remedial action.

112.   Chief Robison and Lt. Splawn were deliberately indifferent to the obvious need for training in criminal apprehensions, bite work, and recalls, as well as remedial training to address K9 Ares' known problems with uncontrolled aggression.

113.   On July 25, 2021 at approximately 1:00 a.m., Esposito and K9 Ares were assisting Milton Police Department execute an arrest warrant on an armed robbery suspect, Alexander Quezada.

114.   The officers observed Mr. Quezada waiting for an Uber with his friend, Imran Jewell, on the sidewalk outside.

115.   Neither Mr. Quezada nor Mr. Jewell were committing a crime while waiting on the Uber.

116.    After. being advised that he was under arrest, Mr. Quezada immediately surrendered to the officers who successfully executed the arrest warrant without incident.

117.    Mr. Jewell did not have any outstanding arrest warrants and was not a suspect in the armed robbery or any other crime.

118.    When Mr. Jewell began to leave, Esposito released K9 Ares to apprehend Mr. Jewell and chased Mr. Jewell into a wooded area.

119.    After a brief chase, Mr. Jewell surrendered on the ground and was not resisting, attempting to flee, or posing any threat.

120.    After Mr. Jewell surrendered on the ground and not posing any threat, K9 Ares began violently biting and chewing on Mr. Jewell's arm.

121.    K9 Ares ignored Esposito's commands to stop and release the bite ("Los!"), and continued exhibiting uncontrolled aggression by chewing on Mr. Jewell's arm for over a minute while Mr. Jewell was not resisting, not attempting to flee, and not posing any safety threat.

122.    After allowing K9 Ares to continue chewing on Mr. Jewell's arm for over a minute, Esposito eventually released the bite by physically "lifting [Ares] off" of Mr. Jewell.

123.   Mr. Jewell suffered serious injuries which required treatment at the hospital.

124.   Following the K9 bite of Mr. Jewell, Esposito prepared and submitted a UOF report to his supervisor, Lt. Splawn, prior to the end of his shift.

125.   Prior to the end of Esposito's shift, Lt. Splawn reviewed Esposito's report and body camera footage and expressly approved of Esposito's deployment of K9 Ares on Mr. Jewel without further inquiry or action, concluding that the extended K9 bite of Mr. Jewell was in accordance with the department's policies and training.

126.   Every reasonable K9 supervisor would have known that the extended K9 bite of Mr. Jewell was a grossly disproportionate and objectively unreasonable use of force which violated clearly established law.

127.   Lt. Splawn did not place Esposito and K9 Ares on administrative leave pending further investigation, and otherwise took no remedial action to address Ares' repeated problems with uncontrolled aggression.

128.   Lt. Splawn allowed Esposito and K9 Ares to return to service for their next shift later that same evening without any restrictions.

129.   Lt. Splawn was deliberately indifferent to the known and confirmed risk that K9 Ares would continue to exhibit uncontrolled aggression and would

inevitably again cause serious injuries during a bite by chewing and ignoring his handler's commands to stop.

130.   K9 Ares did in fact continue to exhibit the same problems with uncontrolled aggression when Esposito and K9 Ares responded to Plaintiff's residence during their next shift, and again ignored his handler's commands to stop before engaging in a bite, and aggressively chewed on Plaintiff's arm during the bite

131.   Following the subject incident, Chief Robison reviewed the officers' reports and body camera video footage and despite knowledge of the K9's prior problems with uncontrolled aggression, ratified and approved of K9 Ares again ignoring his handler's commands and aggressively biting and chewing on Plaintiff's arm after he had been fully secured and not resisting or posing any safety threat, as well as the underlying basis thereof.

132.   On or about November 3, 2021, given K9 Ares' problems with uncontrolled aggression to which the City repeatedly turned a blind eye and took no action to remedy, the City surrendered K9 Ares to his original owner "because of several incidents in which Ares bit, or otherwise acted aggressively toward its Alpharetta Department of Public Safety handlers."

133.    Defendants Splawn and Robison's deliberate indifference and ratification were the moving force behind Plaintiff's damages and as such, said Defendants are liable in their individual supervisory capacities under § 1983.

134.    At all times material herein, Chief Robison's actions as the final policymaker spoke for the City and as such, the City is also liable for Chief Robison's deliberate indifference to the obvious need for remedial training to address K9 Ares' known problems with uncontrolled aggression, as well as his ratification of K9 Ares' unconstitutionally deficient K9 training, which were the moving force behind Plaintiff's damages.

## COUNT VII
## Punitive Damages

135.    Defendants' conduct as described herein evidences willful misconduct, malice, fraud, wantonness, oppression, and an entire want of care which is sufficient to establish that Defendants acted with conscious indifference to the consequences of their actions.

136.    Plaintiff is entitled to an award of punitive damages under state and federal law.

## COUNT VIII
## Attorney's Fees

137.    Plaintiff is entitled to an award of costs, including but not limited to reasonable attorney's fees, under 42 U.S.C. § 1988.

138.    Defendants acted intentionally and in bad faith, and have caused Plaintiff unnecessary trouble and expense, entitling Plaintiff to an award of attorneys' fees under O.C.G.A. § 13-6-11.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays that he have a trial before a jury on all issues and judgment against Defendants as follows:

(a)    That Plaintiff recover general, compensatory, and punitive damages based on Defendants' violations of state and federal law;

(b)    That Plaintiff recover reasonable attorney's fees and expenses of litigation under 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11;

(c)    That all issues be tried before a jury; and

(d)    For such other and further relief as the Court deems just and proper.

This 26th day of July, 2022.

/s/ Dianna J. Lee
L. Chris Stewart
Georgia Bar No. 142289
Dianna J. Lee
Georgia Bar No. 163391

**STEWART MILLER SIMMONS TRIAL ATTORNEYS**
55 Ivan Allen Jr. Blvd.
Suite 700
Atlanta, Gerogia 30308
(844) 874-2500 main
cstewart@smstrial.com
dlee@smstrial.com